Wilson F. FOWLE, Appellant,

v.

C & C COLA, A DIVISION OF ITT–CONTINENTAL BAKING COMPANY and ITT Corporation, ITT–Continental Baking Company, a division of ITT/International Telephone and Telegraph, ITT/International Telephone & Telegraph Corporation, and Ralph Pausig.

No. 88–5206.

United States Court of Appeals, Third Circuit.

Argued July 28, 1988.

Decided Feb. 16, 1989.

Paul Schachter (argued), Reinhardt & Schachter, Newark, N.J., for appellant.

Francis X. Dee, Patrick G. Brady, Kevin C. Donovan, Carpenter, Bennett & Morrissey, Newark, N.J., for appellees.

Before GIBBONS, Chief Judge, SEITZ, and HUTCHINSON, Circuit Judges.

OPINION OF THE COURT

SEITZ, Circuit Judge.

I.

Plaintiff Wilson Fowle appeals from an order of the district court granting summary judgment in favor of defendants C & C Cola, ITT–Continental Baking, ITT/International Telephone and Telegraph Corporation[1] and Ralph Pausig. The district court had jurisdiction of Fowle's Age Discrimination in Employment Act (ADEA) claim, 29 U.S.C. § 621, *et seq.*, under 28 U.S.C. §§ 1331 and 1343, and of Fowle's state law claims under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

II.

This case arises out of defendants' failure to hire plaintiff Wilson Fowle for three positions after his job at ITT was eliminated by ITT's sale of C & C Cola to Shasta Beverages in March, 1982. In the district court, Fowle alleged violations of the ADEA, the New Jersey Law Against Discrimination, N.J. Stat.Ann. 10:5–1, *et seq.*, the New Jersey Constitution, Art. I, Par. 1, New Jersey public policy, oral and written promises by defendants, and contractual obligations created by ITT policies. The district court granted summary judgment for the defendants as to all of Fowle's claims. Fowle brought this appeal which implicates particularly abstract considerations because of the executive nature of the positions involved.[2]

In an appeal from a district court order granting summary judgment our review is plenary. We apply the same test used by the district court: whether there is no genuine issue of material fact, and whether the defendant-appellee is entitled to judgment as a matter of law. An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986).

A. THE ADEA CLAIMS

We will turn first to Fowle's ADEA claims. The three-stage shifting burden originally developed in the context of the title VII employment discrimination action, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1980), has been adapted for use in the analysis of disparate treatment claims under the ADEA. *See, e.g., Maxfield v. Sinclair International,* 766 F.2d 788 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). The plaintiff first has the burden of making out a prima facie case of employment discrimination. The specific items of proof required in making out a prima facie case vary with the factual setting. *See, e.g., McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. To make out a prima facie case of age discrimination in a case of failure to hire, plaintiff must show 1) that he belongs to the protected class, 2) that he applied for and was qualified for the job, 3) that despite his qualifications he was rejected, and 4) that the employer either ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination, *see Maxfield,* 766 F.2d at 793, or continued to seek applicants from among those having plaintiff's qualifications, *see McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

If a prima facie case is established, the burden then shifts to the defendants "to articulate some legitimate, nondiscriminatory reason" for the failure to hire. *Id.* If such a reason is offered, the plaintiff then has the burden of showing that the proffered reason was in fact a pretext. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

---

**1.** These defendants explain that they are inaccurately named in the caption in this case, and that their accurate names are Continental Baking Company and ITT Corporation.

**2.** Fowle has not raised his New Jersey Law Against Discrimination claim before us.

The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* Thus, "a plaintiff can prevail by means of indirect proof that the employer's reasons are pretextual without presenting evidence specifically relating to age." *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 898 (3d Cir.) (in banc), *cert. dismissed,* —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

Because of this structure of proof, an ADEA defendant can prevail on a summary judgment motion in two different ways. "The defendant may show that the plaintiff can raise no genuine issue of fact as to one or more elements of the plaintiff's prima facie case. The defendant may also introduce evidence of nondiscriminatory animus and show that the plaintiff can raise no genuine issue of fact as to whether the proffered reason is a pretext for discrimination." *Spangle v. Valley Forge Sewer Authority,* 839 F.2d 171, 173 (3d Cir.1988) (citation omitted).

1. *The Vice President—Director of Marketing Position*

Fowle first alleges that the defendants failed to hire him for the position of Vice-President Director of Marketing at Continental Baking. Some background is in order. Because this case comes to us on the grant of defendants' motion for summary judgment, we will draw every justifiable inference favorable to Fowle in our narration of the facts. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Wilson Fowle was first hired by ITT Corporation on December 26, 1972—when he was 46 years old—as Staff Assistant-Office of the President at ITT World Headquarters. The job description for the position for which Fowle was hired set forth the criteria for the job: "Ultimately ... the decision must be based on the potential of any candidate to take on the Presidency of an Operating company minimally, and preferably, Group Executive responsibilities for a group of companies."

The job description contemplated possible transfer after a relatively short period of time to a position of management responsibility in a group, sub-group or operating company of ITT. Fowle, however, was not transferred. Fowle was assigned the duties of Product Line Manager (PLM), Food Products and Services.

In 1978 and 1979, Fowle was given written Executive Performance Review evaluations by his immediate supervisor. These evaluations were both excellent. The 1978 evaluation found that Fowle was "qualified as a candidate for broader responsibility on the basis of experience and knowledge." The evaluation stated that Fowle's "leadership qualities are difficult ... to assess due to staff function of work and relatively short time of working relationship."

In 1979, ITT entered a period of divestiture. In January, 1980, Fowle was transferred from his PLM position at ITT World Headquarters. However, he remained with ITT, subsequently holding several positions at Continental Baking Company (CBC) and Morton Frozen Foods, two food group companies within ITT. In January, 1981, Fowle was made Vice President of Marketing at C & C Cola, then administered under Continental Baking and a part of the ITT System.

Late in 1981 rumors began to circulate that ITT would sell C & C Cola. Fowle wrote to Frank Wuerful, then C & C's president, expressing his desire to continue working within ITT in the event C & C were sold. He expressed concern especially that, having worked at ITT nine years, he not lose his pension which would vest after ten years of employment. Wuerful responded with a note that said "[i]f there should be any change in C & C's status I will see that your tenure with ITT is protected."

Fowle also wrote to defendant Ralph Pausig, then ITT's Director of Personnel, reiterating his desire to find an alternative assignment within ITT in the event of a change of status at C & C Cola. Pausig responded that "we will do all we can to place you in CBC. Other ITT opportunities, right now, look very sparse.... We

certainly can't guarantee anything, but we recognize your contribution and will try hard to find a fit for you."

Early in March, 1982, Wuerful informed Fowle that C & C Cola had been sold by ITT to Shasta Beverages. Fowle was at this time 55. On March 18, 1982, Fowle had a telephone conversation with John Porter, then CBC's Vice President—Director of Personnel, about job possibilities with Continental Baking. Fowle secretly tape recorded this conversation.

Porter told Fowle about one open position at Continental: Vice President—Director of Marketing. This position had originally been created in 1981 by the former President of CBC, G. Michael Hostage, then President of CBC. A management consulting firm had been hired in 1981 to develop position specifications and to undertake an executive search for the position. Porter told Fowle that the position had two requirements. The person selected had to be a generalist with a marketing orientation, and he had to have the potential to serve as a "backup" to the president of Continental. As envisioned at the time Lauren Batty—CBC's new president—took office at the beginning of 1982, this second requirement meant that the Vice President—Director of Marketing would have to have the potential to replace the President of CBC within two to four years.

Porter explained that Batty had been unsure about whether he wanted to fill the position at all, had considered shifting the focus of the position toward sales and away from marketing, and had not yet hired anyone although there was an open requisition for the position.

Porter told Fowle that Batty had considered Fowle for this job. "In that regard [your name] has come up. 'Why wouldn't you want Bill Fowle as a candidate?' And for whatever set of reasons, I guess the feeling there is: 'I'm not sure that Bill would be the generalist that we would want to have backing me up.' It's a twofold thing. If it was strictly a marketing assignment, I don't think there would be a problem. But I don't think, at this point,

he sees you as a potential President of a billion and a half dollar corporation."

Fowle asked Porter about the possibility of future employment at Continental if he were able first to work out some consultancy arrangement with Shasta for six months to permit his pension to vest. Porter said "I don't want to hold out a lot of hope. I mean if something happens to a Rudy Norris [Continental's Director of Bread Products Marketing] or a John Bates [Continental's Director of Cake Products Marketing], then I would say 'sure.' But in the absence of that ..."

On April 5, 1982, Fowle was informed that he would not be hired by Shasta, and would be terminated by ITT unless an alternative assignment were found. However, Shasta and Continental Baking were able to work out an arrangement that— when combined with severance and other payments—permitted Fowle's pension to vest. Fowle was to consult for Shasta for six months. CBC agreed to keep Fowle on its payroll during this time. Shasta would reimburse CBC. This arrangement commenced on March 30, 1982.

In June, 1982, Fowle accepted an offer of employment as Vice President of Marketing at the Seven Up Company in St. Louis, Missouri. He terminated his consultancy with Shasta on July 30, 1982, and began work for Seven Up on August 2.

Meanwhile, defendants were looking for someone to fill the still-open Vice President—Director of Marketing position at CBC. On October 14, 1982, John Whitmer —a 41-year old with a background in marketing—was hired for the job.

Almost a full year later, on September 27, 1983, Fowle first learned, in a telephone conversation with a former associate at ITT, that Batty had decided to fill the Vice President—Director of Marketing job and that someone—Whitmer—had been selected for the position. On October 5, 1983, Fowle filed a charge with the Equal Employment Opportunity Commission, and on April 4, 1984, he commenced this action.

#### a.

The defendants allege that Fowle has not introduced material in the record sufficient to support a finding that he was "qualified" for the position of Vice President—Director of Marketing at Continental, i.e. they contend that he has failed to raise a genuine issue of fact as to the second element of his prima facie case.

The defendants do not argue that Fowle lacked the background qualifications—e.g., early experience in advertising, ten to fifteen years of marketing management experience, work in consumer goods—to meet the marketing requirements of the Vice President—Director of Marketing job. Rather, they argue that Fowle did not have the management and leadership skills necessary to qualify him as a potential replacement for the president of CBC, the second broad qualification upon which the successful candidate was to be chosen.

#### i. *Consideration of Subjective Criteria*

We are required first to consider at what stage such qualifications as leadership and management skills are properly considered within the three-stage discrimination claim analysis developed in McDonnell Douglas and Burdine. Plaintiff contends these are "subjective" qualifications and that they should not be part of the prima facie case.

Our Circuit has not in terms addressed this issue. However, at least three other Courts of Appeals that have considered this question have concluded that so-called "subjective" qualifications should be considered in the second and third stages of the *McDonnell Douglas/Burdine* analysis. *See, e.g., Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir.1985) ("the policies behind the *McDonnell Douglas* template would best be served by limiting the prima facie showing of 'qualification' to relative objective qualifications.") These courts have reasoned that evaluations that a plaintiff lacks these qualities are more susceptible of abuse and more likely to mask pretext. "[S]ubjective decision making provides an opportunity for unlawful discrimination." *Burrus v. Unit-*

*ed Telephone Co.,* 683 F.2d 339, 342 (10th Cir.) (citation omitted), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). In *Burrus,* the Court of Appeals for the Tenth Circuit concluded that if a plaintiff's failure to establish that he met such criteria could defeat his prima facie case, the court would not have an opportunity to examine whether the use of these criteria was mere pretext. The court stated that "[t]his result is clearly at odds with the mandate of *McDonnell Douglas* that a plaintiff be afforded a full and fair opportunity to demonstrate that the stated reason for rejection was in fact pretext." *Id.*

The Court of Appeals for the Ninth Circuit has also held that "objective job qualifications are best treated at step one and subjective criteria, along with any supporting evidence, are best treated at the later stages of the process. To do otherwise would in many instances collapse the three-step analysis into a single initial step at which all issues would be resolved." *Lynn v. Regents of the University of California,* 656 F.2d 1337, 1344 (9th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed. 2d 59 (1982).

We do not think that any blanket rule about subjective criteria will adequately serve the purposes behind the procedure mandated by the Supreme Court's decisions. For example, our Circuit has recently ruled on a case in which qualifications similar to those required by the job in this case were at issue. In *Spangle v. Valley Forge Sewer Authority,* 839 F.2d 171, we were faced with an alleged constructive discharge from a job that required the ability to perform supervisory and managerial duties. In that case, the plaintiff had already been employed by the defendant company in the position that had these requirements. Contemporaneous performance appraisals uniformly showed that the plaintiff did not possess the ability to perform these duties.

In *Spangle,* the court implicitly concluded that there could be situations where subjective qualifications could be considered as part of the prima facie case. The *Spangle* court held that the plaintiff

who had adduced no material in the record on summary judgment demonstrating his ability to perform satisfactorily the required supervisory and managerial duties had failed to make out an essential element of his prima facie case.

By contrast, in this case, we believe that the subjective qualifications for the job are properly cognizable at the later stages of the *McDonnell Douglas/Burdine* analysis. The burden of making out a prima facie case is "not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094. To prevent this plaintiff from establishing his prima facie case because he has introduced insufficient material in the record that he possesses subjective qualifications would improperly prevent the court from having an opportunity to examine whether the use of these criteria was mere pretext.

We therefore conclude that plaintiff Fowle has established a prima facie case of age discrimination. The defendant employer next has the burden of articulating a legitimate, non-discriminatory reason for its failure to hire Fowle, which it has met by asserting Fowle's lack of leadership and management skills. The burden thus returns to Fowle who must—in order to defeat defendants' motion for summary judgment—raise a genuine issue of material fact as to whether this proffered reason is a pretext.[3]

ii. *Proof of pretext*

(a)

(1)

■ In attempting to show that the defendants' proffered reason is merely pretext, Fowle first argues that potential to replace the President of CBC was not, in fact, a qualification for the job. In July, 1982, a new position specification was prepared stating that the successful candidate should be a "potential replacement for the President and Chief Executive Officer" of CBC only "within five to six years," rather than within two to four years. Contemporaneous documents and uncontradicted testimony indicate that this change was made by Batty with ITT's agreement.

In August, John Whitmer—ultimately the successful candidate—was first considered for the Vice President—Director of Marketing position. A late September memo from defendant Pausig to Richard Bennett, then Senior Executive Vice President of ITT and one of the ITT executives who interviewed Whitmer, expressed Pausig's strong reservations about Whitmer. "I've seen him," Pausig wrote, "and agree he could be a good candidate for Director of Marketing, but I cannot see him as a strong future potential for President–CBC. Certainly not in 2–4 years." But, Pausig continued, "Batty wants him and, therefore, would do everything to make it work."

In an ITT interoffice memorandum in mid-October, Bennett wrote to Pausig concerning Whitmer, "probably you are right not a back-up for Larry [Batty] but a good m[ar]k[e]t[in]g man. I'd hire him." That same day, Pausig wrote a memo to Karl E. Pierson, then ITT's Director of Management Staffing, Continuity and Development, saying that Bennett "wants him hired even though he agrees he may not be a potential back-up.... I don't think it's smart—but couldn't convince him." Batty concluded that Whitmer was right for the job, but in a memo to Pierson seeking approval to hire Whitmer, stated only that Whitmer had the "potential to be a replacement for me in a five to ten year time frame." Batty repeated this evaluation in his deposition testimony.

(2)

In support of his argument that there was no "backup" requirement, Fowle points first to an undated ITT job description labelled "Director of Marketing, CBC–Bakery Division." This position specification does not include the potential to succeed the president as a requirement for the job. This job description, however, does not appear to refer to the Vice President—Director of Marketing job at issue in this case. The rest of the evidence uniformly

---

**3.** Fowle does not rely on any claim that there is any direct evidence of discrimination.

suggests that at the beginning of 1982, when Lauren Batty became President of CBC, the job description in effect contained a requirement that the successful candidate be able to replace the President of Continental within a two to four year time frame. Concededly, after Batty became President this requirement was relaxed, and the new job description prepared in July, 1982, sought a person with potential to replace the President of Continental within five to six years, but there is no evidence that this was an abandonment of the qualification of presidential potential.

Fowle also argues that the October, 1982, memoranda of Bennett and Pausig demonstrate that Whitmer was not qualified to be potential president of CBC. He argues that Batty's statement that Whitmer had the potential to replace the president within five to ten years—the abandonment of the shorter time frame just in time to hire Whitmer—demonstrates that the "successor" requirement was actually meaningless.

At most this suggests an evolution of the position's specifications between the time Fowle was told he would not be considered for the job and the time Whitmer was hired. There is no evidence that potential to replace the President—in whatever the time frame—was not a requirement of the Vice President—Director of Marketing job when Fowle spoke to Porter about the position. That these requirements were relaxed later—perhaps because of the difficulty of finding a qualified individual to take the job—is not evidence such that a reasonable factfinder could conclude that the potential to replace the president of CBC was not a requirement of the Vice President—Director of Marketing job. We conclude that on this record Fowle has not adduced tangible material sufficient to permit a reasonable jury to find that the job did not actually contain this successor requirement. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### (b)

■ Plaintiff can be understood next to challenge the *basis* for defendants' assertion that he lacked the leadership and management skills necessary for the Vice President—Director of Marketing job. In his certification, Fowle argues that Batty's evaluation of Fowle—allegedly based on observations by Batty and his staff of Fowle when Fowle was Product Line Manager at ITT and Batty was President of Continental Baking's Bakery Division—was based on a misunderstanding of the nature of Fowle's duties as Product Line Manager. As Fowle put it in his certification, "I was not supposed to be a manager or leader in the sense Mr. Batty is using it. . . . If Mr. Batty was assessing me as he would have assessed a person with direct authority, he was applying the wrong standards and so could not use his assessment as the basis of a legitimate evaluation."

This material is insufficient to raise a genuine issue of material fact as to whether Batty actually reached this conclusion or whether his assertion was a pretext put forward to justify his decision not to hire Fowle for the Vice President—Director of Marketing position. Fowle's certification only raises a question about the accuracy of Batty's understanding of Fowle's role as PLM. This is not "material" to whether the defendants' proffered justification here is "unworthy of credence," *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, this material in the record is insufficient to raise a genuine issue of material fact as to whether the defendants' articulated reason for failure to hire him, that he lacked certain requisite subjective qualifications for this job, was mere pretext.

### (c)

■ Fowle next argues that—with evidence of his leadership and management skills—he has in any event raised a genuine issue of material fact as to whether the defendants' proffered reason for the failure to hire Fowle was a pretext. Fowle relies first on the job description of the original position for which he was hired by ITT in 1972. However, a statement ten years before the challenged employment action that Fowle had the potential to take over a major profit center or operating company "within a relatively short time," combined with the fact that Fowle was

never given such responsibility during the ensuing decade hardly presents evidence such that a reasonable factfinder could return a verdict that defendants' assessment of Fowle in March, 1982, was "unworthy of credence," *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Fowle next seeks support in his written performance evaluations. However, Fowle's written job assessments during his time as a Product Line Manager while positive, do not address the leadership ability or management skills required by the Vice President—Director of Marketing position. Indeed, in his own certification, Fowle—challenging Batty's evaluation of Fowle allegedly based on Fowle's performance as PLM—states "I was not supposed to be a manager or a leader in the sense Mr. Batty is using it." Neither is the statement in one written evaluation that he was "ready to take on new greater responsibility" evidence that Fowle had the potential to run a large corporation.

■ Fowle also relies heavily on a document purporting to be a "report" of an alleged expert, Hugh Lefkowitz. A "true cop[y]" of this document was submitted to the district court attached to an affidavit of plaintiff's counsel, Paul Schachter. The defendants assert that they raised in their reply brief in the district court an argument that, because this report was not attached to an affidavit or deposition of Mr. Lefkowitz, but rather was attached to an affidavit of plaintiff's counsel, it did not meet the requirements of Federal Rule of Civil Procedure 56(e). The district court did not rule on defendants' contention, because it assumed admissibility and concluded that the material in the record was not sufficient to raise a genuine issue of material fact under the standard set out in *Anderson.*

■ We prefer to rest our ruling on the fact that there was no compliance with Rule 56(e). The rule reads in relevant part "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). The substance of this report was not sworn to by the alleged expert. Therefore, the purported expert's report is not competent to be considered on a motion for summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970) (unsworn statement does not meet the requirements of Fed.R.Civ.P. 56(e)). While evidence should not be excluded on summary judgment on hypertechnical grounds, we are swayed in this case by the fact that defendants raised this issue in the district court, and plaintiff did nothing to correct the error before that court. Therefore, we will decide this case without reference to the unsworn expert's report.[4]

Consequently, after examining all the material in the record competent to be considered on summary judgment, we conclude that plaintiff Fowle has not adduced evidence of his qualifications sufficient to raise a genuine issue of material fact as to whether defendants' articulated reason for failing to hire Fowle was a pretext for discrimination. Thus, as the district court concluded, he cannot defeat defendants' motion for summary judgment on his ADEA claim concerning the position of Vice President—Director of Marketing.

### 2. *The Bread and Cake Products Marketing Positions*

■ Fowle also claims an ADEA violation in defendants' failure to hire him for either the Director of Bread Products Marketing or Director of Cake Products Marketing positions when they opened up at Continental. Over five months after Whitmer was hired for the Vice President—Di-

---

**4.** The plaintiff—apparently in an attempt to correct this defect—made a motion before this court to supplement the Joint Appendix with the cover and index pages of a deposition of Hugh Lefkowitz. Plaintiff's motion was granted by the clerk, and defendants moved, pursuant to Fed.R.App.P. 27(b), to reconsider and vacate the court's order. Because consideration of the material proffered by plaintiff would impermissibly expand the record, *see, e.g., United States v. Lowell,* 649 F.2d 950, 966 n. 26 (3d Cir.1981), we will grant defendants' motion to reconsider and vacate.

rector of Marketing job—almost eight months after Fowle began work at Seven Up—at the end of March, 1983, John Bates resigned as Director of Cake Products Marketing at Continental. Rudy Norris, then 51—Continental's Director of Bread Products Marketing—was reassigned to Bates's former position, and M. Suzanne Herrick, then 36, was promoted from her position as Director of Established Bread Products at Continental to fill the position Norris was vacating as Director of Bread Products Marketing. Fowle was not considered for either job.

It is true that in March, 1982, John Porter suggested to Fowle that—if these positions were open and Fowle sought them after a six month consultancy—he might have been selected for them. However, Fowle must of course show as a part of his prima facie case that an application for these positions was made.

In order to establish that he "applied" for a position, a plaintiff need not necessarily file a formal application. *See, e.g., Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984) (where employer gives no formal notice of job's availability, it has a duty to consider all those who might reasonably be interested). Generally speaking, we think it is sufficient to make out a prima facie case for a plaintiff to "establish[ ] that the company had some reason or duty to consider him for the post." *Cf. id.* Ordinarily, this will present a minimal obstacle, consistent with the Supreme Court's statement in *Burdine* that "the burden of establishing a prima facie case is not onerous." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

However, in the unique circumstances of this case, we conclude that Fowle has failed to adduce material in the record sufficient to show that the defendants had any reason or duty to consider him for these two marketing positions when they became open. When these positions opened up, Fowle had not been in touch with those responsible for hiring at ITT about possible openings in over seven months. Indeed, he was apparently not in contact with them for at least six *more* months following the

filling of the Bread and Cake Products marketing positions, as he was not even aware of any of the challenged employment actions until September, 1983.

Fowle asserts that he wanted to keep the fact of his new job secret from those at ITT, because he wanted to continue being considered for any positions that opened at ITT for which he might be qualified. Even if the defendants were not aware he had been employed by Seven Up, we conclude that Fowle has not adduced sufficient material on this record to raise a genuine issue of material fact as to one of the elements of his prima facie case—his having applied for either the Director of Cake Products Marketing or the Director of Bread Products Marketing job at Continental at a time when either of those positions was open. Thus, the district court's grant of summary judgment on these claims was correct.

## B. STATE LAW CLAIMS

Fowle also puts forward several claims of breach of contract under New Jersey law. These claims are based both upon written company policies that Fowle alleges amounted to contractual promises under *Woolley v. Hoffmann La–Rouche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985), *modified*, 101 N.J. 10, 499 A.2d 515 (1985), and upon alleged oral promises made to Fowle by ITT executives.

The policy provisions relied upon by Fowle appear in ITT Personnel Guide 13.0 ("When filling open positions, it is ITT policy to give careful consideration to candidates from within the ITT system."), ITT Personnel Guide 15.0 ("No executive is separated from the payroll by any ITT unit before a determination is made of whether the executive's skills can be effectively utilized elsewhere in the ITT system."), and ITT Personnel Guide 10.0 which Fowle argues prohibits consideration of views not included in formal Executive Performance Evaluation Review when considering an ITT executive for another position within ITT.

We have concluded that Fowle has been unable to adduce sufficient material to raise a genuine issue of material fact as to whether defendants' assertion that he

lacked the qualifications for the Vice President—Director of Marketing job was a pretext or whether he applied for the Cake and Bread Products Marketing jobs. Thus, we agree with the district court that, even if these ITT policies amount to binding promises under *Woolley*, Fowle has not raised a genuine issue of material fact that the relevant policy provisions were not fully complied with.[5]

Fowle also alleges that the statement of C & C President Frank Wuerful that Wuerful would "see that your tenure with ITT is protected," was a promise of a regular alternative assignment within the ITT system. This is a fanciful reading of the language of Wuerful's note in the context of Fowle's expressed concern about the vesting of his pension, and one that could not be inferred by any reasonable jury. We reject Fowle's contention that the question of interpretation raises questions of credibility and intent sufficient to defeat a summary judgment motion. We also observe that arrangements ultimately were made permitting Fowle's pension to vest.

Lastly, Fowle alleges that ITT executives promised him a full-scale job search within and without ITT. Even assuming there were binding promises, Fowle's evidence is insufficient to defeat defendant's motion for summary judgment. Fowle has put forward only vague and unsupported assertions of "unreturned phone calls by defendants," "no feedback to plaintiff," "no expressions of interest," and the like. These allegations are insufficient to raise a genuine issue of material fact as to breach. Indeed, there is uncontradicted evidence that ITT executives did try to place Fowle within Continental itself, and that at least one other company within ITT—Sheraton Corporation—was contacted in an attempt to find Fowle a position.[6]

### III.

Consequently, the judgment of the district court will be affirmed.

---

5. Thus we need not address the question whether the *Woolley* decision should be applied retroactively, *compare Cole v. Carteret Savings Bank,* 224 N.J.Super 446, 454, 540 A.2d 923, 927 (Law Div.1988) (*Woolley* applies retroactively) *with Bimbo v. Burdette Tomlin Memorial Hospital,* 644 F.Supp. 1033, 1039 (D.N.J.1986) (*Woolley* does not apply retroactively).

6. Given our conclusion that Fowle's evidence is insufficient to support a verdict of breach of any contractual obligation, we also find without basis his allegation of a deprivation of property

in violation of Art. I, par. 1 of the New Jersey Constitution.

Our conclusions above also dispose of Fowle's state law claim under *Pierce v. Ortho Pharmaceutical,* 84 N.J. 58, 417 A.2d 505 (1980). That case permitted a cause of action for wrongful discharge of an employee-at-will fired for reasons in violation of New Jersey public policy. Because there is not evidence sufficient to support either an age discrimination or a breach of contract claim, we are unable to find that any employment action by the defendants violated New Jersey public policy.