Joseph SAN FILIPPO, Jr., Plaintiff,

v.

Michael BONGIOVANNI, Anthony S. Cicatiello, Adrienne S. Anderson, Donald M. Dickerson, Floyd H. Bragg, Norman Reitman, individually and as members of the Board of Governors of Rutgers University, and Rutgers, the State University, Defendants.

Civ. A. No. 88–2575.

United States District Court,
D. New Jersey.

July 25, 1990.

Leon Friedman, New York City, Stuart S. Ball, Ball, Livingston & Tykulsker, Newark, N.J., for plaintiff.

Carpenter, Bennett & Morrissey, Newark, N.J. by Linda B. Celauro, for defendants.

## OPINION

BARRY, District Judge.

### INTRODUCTION

It is a disgrace that Rutgers, the State University of New Jersey, cannot terminate a faculty member when he or she has committed ethical violations of a high order because, for whatever reason, Rutgers has not seen fit to adopt regulations which would permit it to do so. It is similarly a disgrace that 46 days of hearings which culminated in a 44 page report recommending plaintiff's dismissal because he violated the basic ethical tenets of the profession as evidenced by his exploitation of and threatening and abusive behavior towards individuals who worked under him and his lack of integrity in professional dealings, a report sustained by the Board of Governors in a 60 page opinion, must turn out to be a total waste of time and taxpayers' money. Finally, it is a disgrace that, having committed the gross ethical violations seen here, plaintiff will, most likely, return to Rutgers, although that return will hardly be the return of a conquering hero.

### FACTS

In 1971, Joseph San Filippo, Jr., plaintiff herein, was employed by Rutgers as an untenured Assistant Professor of Chemistry. In 1977, he earned tenure and became an Associate Professor of Chemistry and in 1984 achieved the rank of full Professor. Rutgers does not take issue with his characterization of himself as not only a respected scientist, an accomplished academic, and a prolific writer, particularly in his specialty of organometallic chemistry, but also as a researcher who had the ability to obtain substantial monies in research grants and more than one million dollars of scientific equipment for the University (Third Amended Comp. at ¶ 12). Certainly, however, aside from any professional prowess, Professor San Filippo had to have been a thorn in Rutgers' side, continually voicing complaints and filing grievances and arbitrations concerning a variety of matters and filing at least three legal actions against the University aside from this action, conduct which played no explicit part in Rutgers' decision to terminate him.[1]

Pursuant to University Regulations 3.94, by letter dated January 6, 1986, Dean Tilden Edelstein, Dean of Rutgers' Faculty of Arts and Sciences, New Brunswick, formally advised Professor San Filippo that various complaints had been made against him concerning his mistreatment of visiting Chinese scholars who were performing research in San Filippo's laboratories. Following Professor San Filippo's response in which, for the most part, he denied the allegations and attempted to justify those he admitted, on February 26, 1986, Dean Edelstein advised Provost Kenneth W. Wheeler of the allegations of "harassment, exploitation and attempted exploitation, and fraud," all allegations "so serious" that, if sustained, warrant dismissal. (Pack Aff., Exh. A). The tenured faculty of the Department of Chemistry passed a resolution, concurring.

On April 2, 1986 Provost Wheeler wrote to Dr. T. Alexander Pond, Executive Vice President and Chief Academic Officer, stating that the allegations constitute "a gross violation of the 'Statement of Professional Ethics' contained in University Regulation 3.91 and are totally unacceptable in an academic community." (Id., Exh. B). He rec-

---

1. Professor San Filippo apparently regarded himself as knight errant amicus at Rutgers. Counsel described some of his activities: he "often expressed himself about what he considered dangerous, improper or even illegal activities at the school"; he "threatened to inform the authorities"; he "constantly reminded [the Chemistry Department] of the requirements of federal law"; and he "had numerous disputes with senior department members ... many of which led to his filing of grievances ..." Plaintiff's Memo. in Opposition to Summary Judgment at 8-10.

ommended that Professor San Filippo be formally notified of the allegations which, in his view, warranted dismissal. On August 1, 1986, Dr. Pond advised Professor San Filippo that "the evidence is persuasive that you have violated the basic ethical tenets of our profession and that, in doing so, you have failed in your obligations to this institution." (First Cole Aff., Exh. A). On September 9, 1986, after having given Professor San Filippo yet another opportunity to respond, Dr. Pond recommended to then-President Edward J. Bloustein that appropriate action be taken to recommend Professor San Filippo's dismissal to the Board of Governors.

Pursuant to Regulation 3.97, on October 1, 1986 President Bloustein issued the formal charging document advising Professor San Filippo that he has "violated the basic ethical tenets of our profession, including those standards of professional ethics set forth in University Regulation 3.91, and that, in doing so, you have failed in your responsibilities to this University." (Exh. 1 to Defendants' Answer to First Amended Comp.) The charges, President Bloustein continued, "meet the standards for dismissal set forth in University Regulations 3.93, 3.94, 3.97, and 3.99 and constitute gross neglect of established university obligations appropriate to your appointment and evidence a failure to maintain standards of sound scholarship and competent teaching...." *Id.*

The charges were detailed by President Bloustein:

"1. Your treatment of scholars visiting from the People's Republic of China and a Chinese Teaching Assistant violated the standards of professional ethics required of all faculty members. More specifically, your treatment with respect to these individuals, as set forth more fully in the attached documents, is as follows:

a. You took advantage of your professorial position and exploited Mr. Hetian Gao and Mr. Changhe Xiao, both visiting scholars from the People's Republic of China, by directing them or by leading them to believe that they had no choice but to perform domestic work for you, such as garden work and indoor and outdoor cleaning work during the period May through July 1985.

b. You attempted to exploit Ms. Yaru Zang, also a visiting scholar from the People's Republic of China, by attempting to make her perform domestic work for you.

c. You exploited Messrs. Gao and Xiao by representing that they would be provided health benefits coverage and that you would deduct $700.00 from the salary to be paid each of them in order to cover the costs of such benefits. Despite deducting such sums, you did not provide coverage to either Mr. Gao or Mr. Xiao.

d. During the period of time that the above-named visiting Chinese scholars were at Rutgers, you threatened and harassed those individuals by repeatedly stating that you would send them back to China and by directing abusive language toward them.

e. On or about March 31, 1986, you interrupted without sufficient cause a laboratory class being conducted by Teaching Assistant, Zong Ping Chen. You continued that incident by treating her in an unprofessional, threatening and abusive manner, within the hearing of other individuals, including her students.

2. On or about July 8, 1985, you directed Mr. Changhe Xiao, who had injured himself while doing maintenance work at your house, to identify himself as Mr. Peng Zhou in Middlesex Hospital in order to have Mr. Xiao covered by Mr. Peng Zhou's medical insurance.

3. You encouraged and permitted individuals working under your direction and supervision to submit false time reports and to make inappropriate charges against certain University accounts. Specifically:

a. In or about August 1985, Ms. Abbie Lieber, a secretary who works solely under your supervision submitted a time report form, purportedly to compensate Mr. Hetian Gao and Mr. Changhe Xiao for extra computer (and/or library) work supposedly performed by them, but you told them that the payment was actually

to provide them with money to purchase health benefits from the Chinese consulate. Both Messrs. Hetian Gao and Changhe Xiao thereafter received $100.00 each, charged against your NSF grant, despite the fact that you knew that they had not performed any extra work for the money. (Note the previous promise to provide health benefits recited in item 1.c. above.)

b. Ms. Marilyn Brownawell, who works directly under your supervision, submitted time report forms for the week ending August 17, 1984. She reported and was paid for 40 hours of work for that period, charged against the Chemistry Department's mass spectrometer account, even though you knew that she did not perform any work related to the mass spectrometer or indeed any compensable work for Rutgers of any kind during that period.

4. You violated professional and academic standards and exploited foreign visitors to the University by bringing to the University as post-doctoral fellows Chinese scholars who you knew did not have appropriate credentials and by charging the stipends of such individuals, who did not possess doctoral degrees, to your NSF grant as post-doctoral fellows. Subsequently you supported these individuals for admission to the graduate program in Chemistry, a fact which clearly established that they did not have the credentials to be post-doctoral fellows.

5. During Fall 1985, you submitted an application for admission to the graduate program, including letters of reference, on behalf of Mr. Peng Zhou, one of the individuals referred to in # 4 above. One of the letters of reference submitted by you purportedly was written and signed by Liu Guozhi. In fact, that letter was not prepared by Liu Guozhi, and you had knowledge of that fact and did not make it known when you submitted the letter.

6. On December 16, 1985, Professor Robert Boikess, Chair of your department, specifically instructed you not to permit Mr. Peng Zhou, Mr. Con–Yuan Guo, or any other graduate student ex-cept those already associated with your research group, to work in your laboratory, pending investigation of allegations of exploitation and harassment lodged against you by visiting Chinese scholars. Despite these specific instructions, you subsequently permitted Con–Yuan Guo, Zhen-min He, and Peng Zhou to perform work in your laboratory."

President Bloustein advised Professor San Filippo that he was entitled to a hearing and would receive a hearing upon request. If there was no request for a hearing, however, President Bloustein would recommend to the Board of Governors that Professor San Filippo be dismissed from the University. A hearing was requested.

The evidentiary phase of the hearing commenced on March 30, 1987 before a panel of five of Professor San Filippo's academic peers who were members of the Rutgers University Senate—Noel Da Costa, Mary Fetzee, Richard Hixson, David Wilder, and Ted H. Szatrowski, who served as Chair. The evidentiary phase alone consumed 250 hours over 46 days—only 16 of which were used by the University before it rested its case—and generated 5,800 pages of testimony from 33 witnesses and more than 400 exhibits. The Senate Panel, in a 44 page report issued on December 21, 1987, found that all or parts of Charges 1(a), 1(c), 1(d), 1(e), 2, 3(b), 4, 5 and 6, as set forth in President Bloustein's letter of October 1, 1986 were "true". (Exh. 2 to Defendants' Answer to First Amended Comp. at 42). The panel concluded that Professor San Filippo

violated the basic ethical tenets of our profession, including those standards of professional ethics set forth in University Regulation 3.91 and that, in doing so, Professor San Filippo failed in his responsibilities to the University. The Panel concludes that the 'matters charged and proved' meet the standards for dismissal set forth in University Regulations 3.93, 3.94, 3.97, and 3.99 as evidenced by his exploitation of and threatening and abusive behavior towards individuals who worked under him in a pro-

fessional capacity and his lack of integrity in professional dealings. *Id.*

Based on findings of exploitation, threats, abuse, and "serious lack of integrity", the panel, while conceding Professor San Filippo's "excellent record", unanimously recommended dismissal. *Id.* at 43.

After reviewing the sufficiency of the evidence as to each charge and hearing oral argument, the Board of Governors, in a 60 page opinion issued on May 13, 1988. affirmed—one member dissenting—the recommendation of the Senate Panel and directed Professor San Filippo's immediate dismissal. (Exh. B. to First Amended Comp.).[2]

The Board of Governors dismissed Professor San Filippo on the ground that the charges which it sustained evidenced a failure to maintain standards of sound scholarship and competent teaching, a basis for dismissal under Regulations 3.93, 3.94, 3.97, and 3.99. Those classes of behavior which define the standards of "sound scholarship and competent teaching", it believed, are set forth in Regulation 3.91, which adopted the Statement on Professional Ethics itself adopted by the national American Association of University Professors ("AAUP"). The Board set forth those portions of Regulation 3.91 it believed provided the relevant definition:

> 3.91. Since the very nature of a university and its value to society depend upon the free pursuit and dissemination of knowledge and free artistic expression, every member of the faculty of this University is expected, in the classroom and studio, in research and professional publication, freely to discuss subjects with which he is competent to deal, to pursue inquiry therein, and to present and endeavor to maintain his opinion and conclusions relevant thereto. In expressing those ideas which seem to him justified by the facts, *he is expected to maintain standards of sound scholarship and competent teaching.* He shall conduct himself in accordance with the standards of professional ethics set forth in

paragraph I to V, inclusive, of the Statement on Professional Ethics adopted by the American Association of University Professors at its annual meeting, April 1966.

> Statement on Professional Ethics

> \*　　\*　　\*　　\*　　\*　　\*

> II. As a teacher, the professor encourages the free pursuit of learning in his students. He holds before them the best scholarly standards of his discipline. *He demonstrates respect for the student as an individual, and adheres to his proper role as intellectual guide and counselor. He makes every reasonable effort to foster honest academic conduct and to assure that his evaluation of students reflects their true merit.* He respects the confidential nature of the relationship between professor and student. *He avoids any exploitation of students for his private advantage* and acknowledges significant assistance from them. He protects their academic freedom.

> \*　　\*　　\*　　\*　　\*　　\*

(Emphasis in Board of Governors' Opinion, *id.* at 51–52).

Those charges which, in the Board of Governors' view, were the most serious, i.e. 1(a), 1(d) and 1(e), which concerned Professor San Filippo's order that two Chinese scholars do gardening and cleaning at his home and his threatening and abusive treatment of these two scholars, plus a third, "directly fall under the prohibition of Paragraph II of the national AAUP's Statement on Professional Ethics", *id.* at 52, set forth above. "The behavior stated in these sustained charges demonstrate[s]", the Board concluded, "clear 'exploitation of students for his private advantage' and lack of proper 'respect for the student as an individual' and thereby meet the standards for a dismissible offense under University regulations." *Id.* The other sustained charges, in the Board's view, also constitute a clear "failure to maintain stan-

---

**2.** The dissenting member found "clearly sufficient evidence" to sustain the charges but believed the sanction of dismissal was too severe. *Id.* at 63.

dards of sound scholarship and competent teaching" and, therefore, also meet the standards for a dismissible offense even though the conduct underlying those charges was "not specifically enumerated" in the Statement on Professional Ethics. *Id.* at 53. These charges "flow directly out of Professor San Filippo's activities as a scholar and teacher and constitute serious ethical violations of his responsibilities in these areas". *Id.* at 55.

On June 13, 1988, pursuant to 42 U.S.C. § 1983, Professor San Filippo instituted this action against the University and the six members of the Board of Governors who voted in favor of his dismissal alleging various violations of his rights under the United States Constitution, violations of his corresponding rights under the New Jersey State Constitution, and breach of contract.

More specifically, as set forth in what is by now his Third Amended Complaint, Professor San Filippo alleges: (1) violation of his due process rights on the basis of vague and uncertain University dismissal standards which did not fairly warn him that the acts of which he was accused violated University rules and could serve as the basis for dismissal, ¶ 27; (2) violation of his First Amendment rights and comparable provisions of the New Jersey Constitution by virtue of the commencement of dismissal proceedings and his dismissal in retaliation for his filing of lawsuits, grievances and complaints against the University and its employees, ¶ 28; (3) violation of his equal protection rights and comparable provisions of the New Jersey Constitution in that he was selectively chosen as a target for disciplinary action, ¶ 29; (4) violation of his procedural due process rights resulting from the conduct of the hearing and the negotiation for additional compensation between one or more members of the Senate Panel and the administration while the hearing was ongoing, ¶ 30; and (5) breach of the contract established by Rutgers' rules and regulations because his dismissal was predicated upon offenses which could not be the basis of dismissal under that contract, ¶ 31.

Defendants now move for summary judgment on a host of grounds, to strike affidavits and certain exhibits relied upon by Professor San Filippo in opposition to that summary judgment motion, and, in the alternative, to strike his claim for damages. Professor San Filippo moves for summary judgment as to his claims that the dismissal standards, as applied to him, were unconstitutionally vague and that his procedural due process rights were violated. Neither side of the case asks me to decide the issue—if issue it be—of whether, on the basis of the evidence presented, the charges against Professor San Filippo were proven and whether, based on the evidence as to proven charges, dismissal was warranted.

■ For the reasons that follow, Professor San Filippo's motion for summary judgment on the vagueness claim will be granted and defendants' motion for summary judgment on that claim will be denied. Defendants' motion to strike affidavits and certain exhibits will be denied as well[3] and

---

3. Affidavits submitted in conjunction with a motion for summary judgment must contain admissible evidence within the personal knowledge of the affiant to which he or she is competent to testify. Fed.R.Civ.P. 56(e); *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir.1989); *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988). Defendants have ferreted out from the hundreds of paragraphs that comprise the three affidavits in question and the volumes of exhibits attached thereto numerous legal arguments and conclusions and statements not based upon personal knowledge, as well as other instances of purportedly inadmissible evidence. They do not, however, separate out many statements which, while not based on personal knowledge are, nonetheless, helpful statements of opinion or belief that rest upon an adequate factual foundation, *see* F.R.Evid. 701; and do not distinguish many statements which are not hearsay because they are not offered to show the truth of the matter asserted or are otherwise admissible as exceptions to the hearsay rule. Inadmissible evidence can, in most instances, be excised with surgical precision. *See* 10A Wright, Miller & Kane, *Federal Practice and Procedure*, § 2738, p. 509 ("The court will disregard only the inadmissible portions of a challenged affidavit and consider the rest of it."). Mindful of the admonition that evidence should not be excluded on summary judgment on "hypertechnical grounds," *Fowle, supra,* 868 F.2d at 67, I will disregard those portions of the affidavits that fail to comport with the standards of Rule 56(e). Accordingly, defendants'

their motion to strike Professor San Filippo's claim for damages will be granted in part and denied in part. Given this disposition, the remaining motions need not and, thus, will not be decided.

## DISCUSSION

*The Regulations Defining Dismissible Offenses Do Not Cover and Cannot Be Interpreted To Cover the Conduct For Which Professor San Filippo Was Dismissed.*

■ Certainly, the ethical standards set forth in Regulation 3.91 put Professor San Filippo on notice that the conduct in which he engaged was impermissible. Query: was he on notice that his unethical conduct would, under the University's dismissal standards, be cause for dismissal? Stated somewhat differently, are the ethical standards contained in Regulation 3.91, which incorporates the AAUP Statement on Professional Ethics, legally enforceable rules subsumed within and otherwise defining Regulations 3.93–3.99a, the dismissal standards? Defendants say "yes"; Professor San Filippo says "no." The answer is clearly "no."

First, "Regulation 3.91 Concerning Professional Ethics for Faculty Members," as 3.91, in effect since January 1967, is entitled, never defines, nor was it intended to define, what, if any, ethical violations are dismissible offenses; indeed, the word "dismiss" is nowhere to be found. It sets forth, in plaintiff's phrase, a "moral imperative" for the faculty, and nothing more.[4] Plaintiff's Memo. in Support of Motion for Summary Judgment at 12. Second, when

"University Regulations 3.93–3.99a Concerning Procedures to be Followed in the Dismissal Proceedings of a Tenured Faculty Member," as the dismissal regulations are entitled, were adopted in September 1972, the ethical standards set forth in Reg. 3.91 and, indeed, even the word "ethics," were neither incorporated nor referred to and, thus, violations of those standards cannot be a basis for dismissal. Third, an examination of the proposed, withdrawn, and adopted amendments to the dismissal regulations over a period of more than ten years confirms that violations of ethical standards cannot, of themselves, be the basis of a dismissal decision. None of this is seriously disputed.

Regulation 3.97, as Rutgers' itself conceded in *In re: Villiers*, outlines the only bases for dismissal and this, too, is not in dispute.[5] 3.97 states:

3.97. If the President of the University finds reason to believe that a faculty member should be dismissed when the ground is that he has been convicted of a crime involving moral turpitude, or is incompetent, or incapacitated, or has failed to maintain for himself standards of sound scholarship and competent teaching, the President shall send the faculty member a notice stating in detail the charges against him and informing him that he is entitled to a hearing if he shall ask for it within two weeks and that, in the absence of a request for a hearing, he may be dismissed from the faculty.

Indeed, Rutgers continues to maintain that 3.97 alone sets forth the bases for dismis-

---

motion to strike the affidavits and accompanying exhibits is denied.

**4.** Professor San Filippo concedes that the adoption of 3.91 was not a "meaningless gesture" and assumes that it can be enforced against a faculty member in ways other than dismissal. Plaintiff's Memo. in Opposition to Motion for Summary Judgment at 41, note 3.

**5.** Professor Villiers was charged with "gross neglect of established University obligations appropriate to the appointment," Reg. 3.94. The charges were sustained and he was found to have "repeatedly violated University Regulation 3.91." Friedman Aff.Exh. 20 at 8. Because,

however, 3.97, which, *Villiers* held, defines the dismissible offenses, did not give adequate notice that the transgressions at issue—violations of 3.91 and 3.94—could lead to dismissal, the Board found that Villiers could not be dismissed and imposed a lesser sanction. Similarly, dismissal proceedings against Professor Russell C. Leaf were dropped because of *Villiers*. Three of the seven charges against Leaf charged violations only of 3.91 (*Id.* Exh. 21, 22). Aside from whether *Villiers* and *Leaf* are legally binding, they provide an authoritative interpretation of the Regulations which could thereafter be relied upon. In a nutshell, unless one is charged with a violation of 3.97, he or she cannot be dismissed.

sal, arguing, however, that Reg. 3.91 "defines" standards of sound scholarship and competent teaching, one of the bases for dismissal set forth in 3.97. (Defendants' Br. in Support of Motion for Summary Judgment at 29).

And so while Professor San Filippo was advised by President Bloustein in the formal charging document that he had "violated the basic ethical tenets of our profession, including those standards of professional ethics set forth in University Regulation 3.91," he was also advised that the conduct at issue evidenced "a failure to maintain standards of sound scholarship and competent teaching," an offense set forth in 3.97. (Exh. 1 to Defendants' Answer to First Amended Complaint). Because, Rutgers' argues, the ethical standards of 3.91 "define" standards of sound scholarship and competent teaching, Professor San Filippo's vagueness claim must fail because the dismissal standard invoked here—"sound scholarship and competent teaching"—is not vague as applied to the "serious ethical violations" committed by him, conduct which falls within the clear proscription of the Statement on Professional Ethics. (Defendants' Br. in Support of Motion for Summary Judgment at 29).

The rub is this. Professor San Filippo's "scholarship" and "teaching," as those terms are commonly understood, were never—and are not now—at issue and, were they, the Board would not have had to utilize, as it did, the ethical imperatives of 3.91 to provide "definition" to those terms. Stated somewhat differently, what is clear from the Board's decision is that Professor San Filippo committed ethical violations which had absolutely nothing to do with "scholarship" and "teaching" but because those violations were committed by a scholar and a teacher, "standards of sound scholarship and competent teaching" were supposedly not maintained.

Parenthetically, what leads Rutgers to conclude that 3.91 "defines" "sound scholarship and competent teaching" and how any language in 3.91 relevant to a definition of those terms possibly assists Rutgers is less than clear. Certainly, the terms "sound scholarship and competent teaching" in one sentence are not given definition by the mere exhortation in another sentence, with no apparent connection between the two, to conduct oneself in accordance with the standards of professional ethics. Certainly, too, there is nothing at any point in 3.91 in connection with anything akin to scholarship and teaching competence language that concerns other than the teacher's obligation to his or her students in the academic setting—as the very first sentence of 3.91 puts it, "in the classroom and studio" not, I suggest, in the garden or during indoor or outdoor cleaning. Stated somewhat differently, even if 3.91 defined "sound scholarship and competent teaching" in the academic setting, which it did not, nothing in 3.91 even hinted that it had anything to do with those terms in an extra-curricular setting even assuming that an extra-curricular setting vis-a-vis those terms can be imagined, which it cannot.

Be that as it may, it bears repetition that ethical violations—wherever they occurred—were the basis of the dismissal at issue here and ethical violations only, although the Board was careful to invoke the "sound scholarship" "competent teaching" language, albeit without much enthusiasm. Two examples will suffice. "The serious lack of ethics in the employer-employee relationship found [in charges 1(c) and 2] constitutes adequate ground for finding a lack of maintenance of 'standards of sound scholarship and competent teaching,'" *id.* at 56; charge 4 "concerns the responsibility of a teacher-scholar to act ethically ... and likewise can be considered a failure to maintain 'standards of sound scholarship and competent teaching.'" *Id.* at 56–57.

With ethical violations playing such an important part in the dismissal decision and with any failure to maintain "standards of sound scholarship and competent teaching" —as those terms are commonly understood—seemingly irrelevant, an examination of what, if any, part ethical violations can play in a dismissal decision is important. In early 1980, the Board requested that the administration review the University regulations and statements on the ethi-

cal obligations of faculty and, if warranted, make recommendations, and a select committee of faculty and administrators was established (Friedman Aff., Exh. 4). At the same time, the administration was considering a revision of 3.91 "with particular emphasis on ... dismissal processes." *Id.* A paper entitled "Background Notes: Faculty Ethics at Rutgers," apparently prepared by the Office of the Executive Vice President, was distributed on March 14, 1980 to the committee members. *Id.* at Exh. 5. It described the AAUP Code contained in 3.91 as more comprehensive than other institution—specific codes, yet stating only "broad ethical principles; it does not, in the manner of a legislative code, spell out in concrete detail the specific behaviors which are prescribed or proscribed by those principles." *Id.* at 2, 3. The final report of the committee was submitted to President Bloustein on January 20, 1981 and, with reference to ethical concerns, said little beyond what the "Background Notes" had said and suggested little in the way of change although noting, somewhat curiously in my view, that dismissal was then available as a sanction for ethical violations. *Id.* Exh. 6 at 7.

Meanwhile, an Advisory Committee on Faculty Dismissal Procedures was operating and, on July 15, 1981, its report was forwarded to President Bloustein and the President of the Rutgers Council of the AAUP. *Id.* Exh. 7. That report recommended, as relevant here, that the sanction of dismissal be available only for academic incompetence or for a serious or persistent breach of professorial standards. In determining whether academic incompetence exists or professorial standards have been breached, evidence of

 (1) serious or persistent failure to maintain standards of sound scholarship, competent teaching and professional conduct, or of

 (2) serious or persistent neglect of University obligations which relate directly and substantially to a faculty member's fitness in his professional capacity;

 (3) conduct involving moral turpitude which relates directly and substantially

to fitness as a faculty member shall be relevant. *Id.* Exh. 7 at 3.

Importantly, in a footnote the committee observed that "standards of sound scholarship, competent teaching and professional conduct" incorporates, but is not limited to, among other things, the AAUP Statement on Professional Ethics. *Id.*

Thus, for the first time in many years, violations of ethical standards were explicitly proposed as a basis for dismissal. One wonders why this proposal would have been deemed necessary if, as Rutgers argues, those ethical standards were already incorporated within the terms "standards of sound scholarship and competent teaching" which appear in 3.97 and were to be retained. The proposal was never adopted.

Apparently, additional drafts of the report were prepared by the administration, one draft proposing that a violation of any University regulation would be a basis for dismissal. Friedman Aff. at ¶ 15. Apparently, too, the faculty vociferously opposed that draft with Dean Peter Simmons of the Rutgers Law School describing it as "patent foolishness." *Id.* and Exh. 8 at 2. On March 18, 1982, the draft was withdrawn for revision in light of the comments received. *Id.* Exh. 9.

Almost another year went by before the Final Report of the President's Select Committee on Faculty Ethics was submitted to a closed session of the Educational Planning and Policy Committee on January 26, 1983. *Id.* at Exh. 10. This report proposed a much broader range of conduct to be disciplined, including the discipline of dismissal. Once again, a violation of the Statement on Professional Ethics (now contained in proposed Reg. 3.72) was proposed as a basis for dismissal. The report also proposed that the failure to abide by University rules, regulations, policies, and requests and insubordination be made bases for dismissal. *Id.* at 7, 8. Quoted in full, "cause" as defined in III A of the proposal "shall include but not be limited to:

 1. Failure to maintain standards of sound scholarship, competent teaching

or professional conduct as defined in Regulations 3.71 and 3.72;

2. Failure to abide by University rules, regulations and policies;
3. Neglect of University obligations or responsibilities appropriate to his/her appointment;
4. Failure to comply with administration requests which are appropriate to his/her appointment and which are consistent with University rules, regulations, and policies; or insubordination;
5. Conduct exhibiting gross moral turpitude or depravity and which reflects upon fitness to serve as a faculty member."

*Id.* at 7.

All hell broke loose. 26 members of the Department of Physics—a majority—and 37 members of the Department of Psychology, for starters, submitted resolutions to Provost Wheeler which stated, as pertinent here:

We strongly oppose the following as being far too broad and vague and, therefore, potentially subject to abuse.

(a) Dismissal for "failure to maintain professional conduct";

(b) Dismissal for "conduct exhibiting neglect of established University obligations or responsibilities";

(c) Dismissal for "conduct exhibiting gross moral turpitude . . ."

(d) Dismissal for "failure to abide by university rules, regulations and policies . . . or insubordination."

*Id.* Exh. 11.

Now having struck out twice in terms of obtaining faculty acceptance of its proposed revisions of the dismissal regulations, the administration tried again. In August, 1983, it determined that yet another committee—comprised of administrators, faculty, and AAUP and Board of Governors representatives—would be formed to revise Regulations 3.70–3.99 and that committee was established in late 1983. *Id.* Exh. 12. In April, 1984, a draft of proposed revisions dealing with outside employment was issued and in June, 1986, more than two years later, the Board of

Governors approved those revisions. *Id.* ¶¶ 20, 21; Exh. 13, 14.

On September 16, 1986, the remaining proposed revisions of regulations 3.70–3.99 were submitted to the faculty for comment. *Id.* Exh. 15. The proposed regulation dealing with dismissal (Reg. 3.74) defined "cause" adequate for dismissal as

"persistent or recurrent failure to maintain appropriate standards of sound scholarship and competent teaching, or gross neglect of established obligations appropriate to the appointment or gross disregard of Regulations and other written policies of the University, or conviction of a crime that involves moral turpitude and that reflects adversely upon fitness to serve as a faculty member."

*Id.* at 2.

On February 18, 1987, the proposed revisions were submitted to President Bloustein for approval by the Board of Governors. As of this date—more than three years later—the proposed revisions dealing with termination for cause, 3.70–3.74, and the dismissal regulations, 3.90–3.98, have not been approved.

The foregoing exegesis makes certain things crystal clear. First, as noted earlier, Regulation 3.91—which includes the Statement on Professional Ethics—does not mention dismissal or anything to do with dismissal and the dismissal regulations do not mention ethics or anything to do with ethics. A violation of 3.91 is simply not a dismissible offense and, were it otherwise, there would have been no need in 1967 to specifically incorporate as a ground for dismissal under Regulation 3.97 conviction of a crime involving moral turpitude, a ground, I note, which replaced "conduct . . . reprehensible and detrimental to the University," (Second McNatt Aff., Exh. B, E), a not insignificant fact. Moreover, it makes utterly no sense that while one must actually be convicted of a crime involving moral turpitude before he or she can be dismissed, all of the generalized ethical imperatives set forth in 3.91 but not even alluded to in 3.97 would, nonetheless, similarly permit dismissal. And, of course, if violations of these ethical imperatives were

grounds for dismissal, whether on their own or as "defining" one of the grounds for dismissal set forth in 3.97, why the extraordinary efforts over more than ten years to put in what was already there and why the *sturm und drang* when those efforts were made? [6]

 I return to where I began. Professor San Filippo argues that if the dismissal regulations and, in particular, the "sound scholarship and competent teaching" standards are expanded, by virtue of being defined by 3.91, to cover the charged conduct here, those regulations are unconstitutionally vague because they did not give him fair and adequate notice that that conduct could lead to dismissal.[7] As the Supreme Court observed, albeit in the context of a criminal statute,[8] "there can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347, 352, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964). The argument here is that reasonably precise language—"sound scholarship and competent teaching"—has been expanded by virtue of the unforeseeable and retroactive gloss which Rutgers has placed on it by attempting to slip in 3.91.

Certainly, the history of the dismissal regulations and, aside from a conviction of a crime involving moral turpitude, the aborted efforts to make ethical violations the basis for a dismissal decision, indicate, at least to me, that it was "unforeseeable" that Rutgers would use ethical violations, albeit segued into the "sound scholarship and competent teaching language," to dis-

miss San Filippo and, thus, that he was deprived of his right of fair warning.

Rutgers, however, points me to *Korf v. Ball State University*, 726 F.2d 1222 (7th Cir.1984), in which the Statement on Professional Ethics was found to have adequately notified Korf that what he described as "consensual sexual relationships" with students was cause for dismissal. Korf "should have understood both the standards to which he was being held and the consequences of his conduct." *Id.* at 1228. "[I]t is unreasonable to assume that the drafters of the Statement on Professional Ethics could and must specifically delineate every type of conduct (including deviant conduct) constituting a violation." *Id.* at 1227.

I wholly agree, but those observations do not address the issue before me. San Filippo is not arguing that the Statement on Professional Ethics set forth in 3.91 was not specific enough to cover the types of conduct with which he was charged and, indeed, is not seriously arguing that the charges which were found to be "true" did not constitute violations thereof. He argues that ethical violations are not dismissible offenses, whether charged as a violation of 3.91 or charged as "defining" a violation of 3.97 where there is little or no evidence of any dismissible offense aside from the evidence of ethical violations. *Korf*, in any event, is eminently distinguishable because Ball State, unlike Rutgers, apparently had specifically adopted the Statement on Professional Ethics as an enforceable set of rules violation of which, in and of itself, could lead to dismissal. Moreover, Korf did not argue that violation of the ethical rules could not be a basis of

---

6. To the extent that plaintiff seems to suggest that as to certain of the charges the Board of Governors found that he violated University rules and regulations and was insubordinate, the same reasoning applies. Neither violation of rules and regulations nor insubordination are currently bases for dismissal, and proposals to that effect were vigorously opposed by the faculty. Indeed, the proposed revisions which have been pending for more than three years make only "gross disregard" of regulations a dismissible offense and do not even mention insubordination.

7. If 3.91 is not subsumed within or does not otherwise define "sound scholarship and competent teaching," even Rutgers does not suggest that Professor San Filippo could be dismissed under any other of the very specific offenses set forth in 3.97.

8. The void for vagueness doctrine applies in civil as well as criminal cases. *Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967).

dismissal but only that the rules were vague as applied to his conduct.

Rutgers also cites a host of cases—also irrelevant—which held that various "catch-all" standards—"for such cause as will promote the efficiency of the service" (*Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)); "jeopardize the health, safety and welfare" (*Pesce v. J. Sterling Morton High School District*, 830 F.2d 789 (7th Cir.1987)); "adequate cause" (*Garrett v. Mathews*, 625 F.2d 658 (5th Cir.1980), *aff'g per curiam*, 474 F.Supp. 594 (N.D. Ala.1979)); "other due and sufficient cause" (*diLeo v. Greenfield*, 541 F.2d 949 (2d Cir.1976))—and so on—were not unconstitutionally vague as applied to the conduct at issue in those cases.

But Rutgers has no such "catch-all" provision in its dismissal regulations much less one which would permit it to terminate a faculty member because he or she acted unethically. Significantly, it had such a provision—"conduct ... reprehensible and detrimental to the University"—at one time but deleted it in 1967 and inserted the much more specific "convicted of a crime involving moral turpitude," an insertion which, as noted earlier, makes no sense if the Board believed it was incorporating the Statement on Professional Ethics into its dismissal regulations. (Second McNatt Aff.Exh. B, E). Moreover, 3.93 states that a faculty member can be dismissed only for "adequate cause *as defined in 3.94*" (emphasis added) and Rutgers, in *Villiers* and *Leaf*, further narrowed the grounds on which dismissal may be based to those articulated in 3.97 which has no catch-all provision. And while I could easily find that 3.91, the supposed catch-all "provision," fairly and adequately conveys its meaning and would "catch" the conduct evidenced here, 3.91, pure and simple, is not a dismissal regulation.

"[S]tandards of sound scholarship and competent teaching" cannot include ethical violations committed by a scholar and a teacher even in the academic setting absent embodying the ethical requirements of 3.91 in those standards, as the common sense definitions of those standards in Appendix D of the University's Academic Reappointment and Promotion Policy indicate. *See* Friedman Aff.Exh. 23. Rutgers, it appears, is attempting to come in by the back door after refusing, for years, to come in by the front. As applied to the conduct charged in this case, "failure to maintain standards of sound scholarship and competent teaching" is void for vagueness.

One final note. While, in my view, a University's dismissal standards should permit the option of dismissal where a faculty member "exploits and abuses students and other scholars working under his supervision, lies, cheats, and shows flagrant disregard for University administrative policies and directives," as Rutgers describes Professor San Filippo's conduct, Defendants' Br. in Support of Motion for Summary Judgment at 36, Rutgers' standards do not do so. The fault, if fault it be, lies squarely with the faculty which has effectively blocked every attempt by the administration to beef up the dismissal standards to cover conduct which, particularly in the purely academic setting, is alien to any concept of how civilized professionals should comport themselves.

Perhaps this resistance is, in part, a recognition that "there but for the grace of God go I." Certainly, there is a belief among certain of the highest ranking faculty members that "[d]ismissal procedures bear the same relationship to University operations as capital punishment does to the crime problem—both are largely a matter of public relations and an escape valve for venting aggression and misplaced emotional fervor"—a "public relations challenge to the administration and little more." *See, e.g.,* Friedman Aff.Exh. 8. If what is important to the faculty at Rutgers is public relations, so be it, but the San Filippos of this world will remain in their midst. The taxpayers and, more importantly, the students who, it should not be forgotten, learn by example deserve far more.

 Plaintiff's motion for summary judgment on the vagueness claim will be granted and defendants' motion on that ground, as well as their motion to strike affidavits and exhibits, will be denied.[9]

An appropriate order shall issue.

## ORDER

This matter being opened to the court on plaintiff's motion for summary judgment on the vagueness and due process claims, and defendants' motion for summary judgment on a host of claims and, in the alternative, to strike plaintiff's claim for damages, and defendants' motion to strike affidavits and exhibits relied on by plaintiff; and the court having heard oral argument and in consideration of the submissions of counsel and for good cause shown;

It is on this 25th day of July, 1990 for the reasons expressed in this court's opinion of even date,

ORDERED that plaintiff's motion for summary judgment on the vagueness claim is hereby granted; and it is further

ORDERED that defendants' motions for summary judgment on the vagueness claim and to strike affidavits and certain exhibits, are hereby denied; and it is further

ORDERED that defendants' motion to strike plaintiff's claim for punitive damages is hereby granted; and it is further

ORDERED that defendants' motion to strike plaintiff's claim for front and back pay and for research grants is hereby granted; and it is further

ORDERED defendants' motion to strike plaintiff's claim as to loss of consulting fees is hereby denied.

---

9. Given the disposition herein, the remaining potpourri of motions, save one, need not be decided. That one, i.e., defendants' motion to strike the damage claims, will be granted in part and denied in part. With reference to punitive damages and, aside from whether, as a matter of law, punitive damages are available against Rutgers and the individual defendants in their official capacity, there is no allegation that the members of the Board of Governors named as defendants did anything wrong other than to adopt the Senate Panel's recommendation to terminate plaintiff on a ground which, as a legal matter, I have found to be impermissible. Certainly, there is no allegation of malice or of willful, wanton conduct and Rutgers can have no malice apart from that of its officials. Defendants' motion to strike the punitive damage claim will be granted.

Similarly, defendants' motion to strike plaintiff's claim for front and back pay and for research grants will be granted. Plaintiff obtained new employment at a higher salary without any interim period of unemployment and any monetary loss from the loss of research grants is a loss suffered by Rutgers, and not plaintiff. Defendants' motion to strike plaintiff's claim as to loss of consulting fees, a close question given that plaintiff's evidence on this item borders on the speculative, will be denied. Plaintiff's claim for emotional distress damages has not been challenged.